# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| TYQUIESHA SMITH, a minor child, by her mother, LENORA MORMAN, <br><br> Plaintiff, <br><br> vs. <br><br> JO ANNE B. BARNHART, Commissioner of Social Security, <br><br> Defendant. | No. C04-2048 <br><br> **ORDER** |

This matter comes before the court pursuant to briefs on the merits of this appeal of the Social Security Administration's (SSA) determination of misapplied disability funds. On March 11, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (docket number 8). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I.  PROCEDURAL BACKGROUND

Plaintiff Lenora Morman, as representative payee for her beneficiary daughter Tyquiesha Smith, was informed on March 20, 2001, that she had misapplied $5,638.31 in security funds paid to her on behalf of her daughter. On reconsideration, SSA affirmed the March 20, 2000, determination on May 3, 2001, but corrected the amount in question to $5,226.93. A hearing before Administrative Law Judge (ALJ) Andrew T. Palestini was held on September 20, 2001. The ALJ denied Ms. Morman's appeal in a decision dated May 15, 2002. The Appeals Council denied Ms. Morman's request for review on May 12, 2004. This action for judicial review was filed on July 27, 2004 (docket number 3).

## II. FACTUAL BACKGROUND

Ms. Morman applied for Title XVI supplemental security income benefits in March 1996, on behalf of her daughter, Tyquiesha Smith, who suffers from severe asthma. Tyquiesha's application was approved on August 3, 1999. As representative payee for her beneficiary daughter, Ms. Morman received three retroactive supplemental security income payments totaling $17,954.29 for the period between the March 1996 application and the August 1999 approval. Ms. Morman received payments of: $6,244.29 on August 12, 1999; $6,144.00 on March 3, 2000; and $5,566.00 on September 13, 2000. (Tr. 13). Receipt of the payments was contingent on Ms. Morman depositing the retroactive funds into a dedicated, separate account at a financial institution. (Tr. 26). Withdrawal of the funds was contingent on restrictions set forth in an August 3, 1999, memorandum from SSA. (Tr. 26–29). Allowable expenditures of the dedicated funds were: (1) medical treatment; (2) education or job skills training; and (3) items such as personal needs assistance, special equipment, housing modification, therapy or rehabilitation, or other items/services approved by the local Social Security office. (Tr. 27). The August 3 memorandum stated that if the funds from the dedicated account were used for anything other than the outlined expenses, Ms. Morman would be required to repay the improperly used funds from her own funds. (Tr. 27). Ms. Morman was also required to keep records of all money withdrawn from the dedicated account and receipts for all items/services purchased. (Tr. 27). Ms. Morman signed a copy of the August 3 memorandum on August 12, 1999, and noted that she understood the requirements contained therein. (Tr. 29).

Over the succeeding months, Ms. Morman made numerous requests for expenditures from the dedicated account that were approved by SSA. These included an August 12, 1999, request to use $4,223.40 of the dedicated funds for various moving expenses (Tr. 47); a September 23, 1999, request to use $585.00 of the dedicated funds for household appliance maintenance (Tr. 37); and a March 15, 2000, request to use $728.47 of the dedicated funds for a vehicle repair (Tr. 30). On October 6, 2000,

Ms. Morman's request to use $5,995.55 of the dedicated funds to purchase a 1994 Plymouth Voyager minivan was granted. (Tr. 66). However, SSA notified Ms. Morman at that time that it would no longer "approve any money from dedicated account funds for the purchase or repair of a vehicle." (Tr. 66).

In June 2000, SSA conducted a review of the dedicated account and determined that Ms. Morman withdrew $1,484.53 without obtaining proper authorization. (Tr. 84). When questioned about the expenditure, Ms. Morman stated that the money was spent on a trip to Disney World in Florida and that she would repay the amount in question after she received her tax refund. (Tr. 84). SSA records indicate that the balance of the dedicated account was $5,158.39 after the review. (Tr. 84).

The bank records Ms. Morman provided SSA show a balance of $9,426.30 after the deposit of the last retroactive payment on September 13, 2000. (Tr. 75). The approved expenditure for the Plymouth minivan was made on October 4, 2000. (Tr. 74). The bank records for the dedicated account show approximately 21 cash withdrawals or transfers between October 17 and December 16, 2000. (Tr. 74). The dedicated account had a balance of $574.57 on December 31, 2000. (Tr. 74).

Ms. Morman called SSA on March 12, 2001, and requested an additional $1,500.00 for travel to Florida to look for a place to live. (Tr. 84). During the March 12 conversation, Ms. Morman stated that she could not refund the $1,484.53 she had spent from the dedicated funds for the Disney World trip because of her debt load. (Tr. 84). Ms. Morman stated she had not sought approval for the withdrawn funds because she knew her request would be denied. (Tr. 84). Ms. Morman also confirmed that the dedicated account had a balance of $574.57. (Tr. 84).

SSA notified Ms. Morman on March 20, 2001, that it had determined that she had misapplied $5,638.31 of the dedicated funds. (Tr. 79). SSA stated that Ms. Morman was required to refund these funds out of her personal funds, not any funds dedicated for Tyquiesha's disability, within 60 days. (Tr. 79). SSA stated that Ms. Morman had not

requested permission to withdraw the funds from Tyquiesha's dedicated account and that the money was not spent on "items that were related to or would benefit Tyquiesha's medical condition." (Tr. 79). The SSA determination also noted Ms. Morman's March 12, 2001, statement that she did not request permission to withdraw the funds because she knew SSA would deny her request. (Tr. 79).

Ms. Morman gave a written statement to SSA concerning the above matter on April 23, 2001. (Tr. 92). In her statement, Ms. Morman relayed her financial difficulties, including her significant debt load that included 15 credit cards with balances. (Tr. 92). She admitted that she knew the $1,484.53 she spent on the Disney World trip was not allowed under SSA requirements. (Tr. 94). Ms. Morman stated that the cash withdrawals she made from the dedicated account in late 2000 were for living expenses and for debt payments, but she stated she could not remember exactly "which withdrawal paid which bill." (Tr. 94). Ms. Morman also stated that she made a $1,000.00 deposit into the dedicated account on December 6, 2000, to begin repayment of the non-approved funds she had withdrawn. (Tr. 94). The bank records for the dedicated account show the December 6 deposit and show additional withdrawals of $20.00 on December 6, $500.00 on December 12, and $400.00 on December 16, 2000. (Tr. 74).

In her written statement, Ms. Morman stated that her position that the dedicated funds were not misapplied was based on the fact that she had asked Trish Dawson at SSA for approval of several expenditures, but was continually turned down after March 22, 2000, and thus didn't request permission because she thought Ms. Dawson would refuse. (Tr. 95). Ms. Morman further stated that she had incurred significant debt between the March 1996 application for benefits and the August 1999 approval and that she felt entitled to use the dedicated funds to repay the debt. (Tr. 95).

Ms. Morman testified at the hearing before the ALJ on September 20, 2001. (Tr. 136). She testified that she applied for disability benefits for Tyquiesha and her son, Tyrone Smith, at the same time in March 1996. (Tr. 137). Ms. Morman recounted the

4

expenditures she had made between 1996 and 1999 for Tyquiesha, including purchases of a bed, dresser, clothing, an air purifier, and a dehumidifier. (Tr. 137). She reiterated that she incurred significant debt during this time. (Tr. 137–39).

Ms. Morman also testified that she had become disabled and stopped working in March 2000 after Tyrone became sick. (Tr. 139). Ms. Morman did not specify her disability, but stated that it resulted in a hospital stay and that she was approved for disability benefits in December 2000. (Tr. 139). Ms. Morman testified that she began using the dedicated funds between March 2000 and November 2000, when Tyrone's disability benefits were approved. (Tr. 140). Ms. Morman stated that she used the dedicated funds without permission to prevent cancellation of her credit. (Tr. 140–42).

Ms. Morman was questioned about the Disney World trip at the hearing. (Tr. 142). She stated that following Tyrone's illness and her disability, she had become depressed and subsequently went to Florida to visit her mother. (Tr. 142). Ms. Morman stated that going to Disney World was not the entire purpose of the trip; the purpose was to "enlighten [sic] a little bit of my [Ms. Morman's] tragedy." (Tr. 143). Ms. Morman reiterated that she knew the trip was an improper use of Tyquiesha's dedicated funds. (Tr. 143).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts

from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. The Dedicated Fund Restrictions are Constitutional

Ms. Morman alleges that the law that requires retroactive disability funds to be held in a dedicated account violates the Equal Protection clause of the United States Constitution because: (1) there is no rational basis for SSA's differentiation between disabled children who are owed more than six months of retroactive benefits and disabled children who are owed less than six months of retroactive benefits; and (2) the use restrictions placed on dedicated funds constitute a regulatory taking. The Commissioner of Social Security rebuts Ms. Morman's argument and claims that the fund dedication requirements are constitutional and do not constitute a regulatory taking. This court agrees with the Commissioner's position.

Rational basis is the proper standard of judicial review for equal protection challenges to social welfare programs that do not implicate a suspect class or a fundamental constitutional right. FCC v. Breach Communications, Inc., 508 U.S. 307, 314 (1993), quoted in Minnesota Senior Fed. v. United States, 273 F.3d 805, 808 (8th Cir. 2001). A violation of equal protection does not occur "merely because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485 (1970), quoted in Minnesota Senior Fed., 273 F.3d at 808. Nor does a violation occur because a classification "results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911), quoted in Minnesota Senior Fed., 273 F.3d at 808. Statutory

6

classifications "in areas of social and economic policy . . . must be upheld against equal protection challenge[s] if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. Beach Communications, 508 U.S. at 313, quoted in Minnesota Senior Fed., 273 F.3d at 808. Furthermore, "an administrative agency has considerable discretion in carrying out the mandates of statutes it is entrusted to administer." State of Minnesota v. Apfel, 151 F.3d 742, 745 (8th Cir. 1998). The United States Court of Appeals for the Eighth Circuit has held that unless an agency's determination is "arbitrary, capricious, an abuse of discretion, or otherwise not supported by law," the courts must defer to the agency's discretion. Reder v. Adm'r of Fed. Aviation Admin., 116 F.3d 1261, 1263 (8th Cir. 1997), quoted in Apfel, 151 F.3d at 745.

42 U.S.C. § 1383(a)(2)(F)(ii)(II) sets forth, in pertinent part, approved expenditures for dedicated funds, including expenses for:

> (aa) education or job skills training; (bb) personal needs assistance; (cc) special equipment; (dd) housing modification; (ee) medical treatment; (ff) therapy or rehabilitation; or (gg) any other item or service that the Commissioner determines to be appropriate; provided that such expenses benefits such individual, and in the case of an expense described in item (bb), (cc), (dd), (ff), or (gg), is related to the impairment (or combination of impairments) of such individual.

Any use of dedicated funds in a manner not authorized by the above clause constitutes "a misapplication of benefits . . . and any representative payee who knowingly misapplies benefits from such an account shall be liable to the Commissioner in an amount equal to the total amount of such benefits." § 1383(a)(2)(F)(ii)(III).

Ms. Morman has failed to prove that SSA's determination does not satisfy the rational basis standard set forth by the United States Supreme Court. It is not arbitrary or capricious for Congress to mandate restrictions upon dedicated funds to ensure that the funds are properly used for the beneficiary's care. See Minnesota Senior Fed., 273 F.3d at 809. The restrictions placed upon dedicated funds represent policy decisions by Congress as to how to best effectuate the process of providing funds to minor beneficiaries.

Although, as claimed by Ms. Morman, the restrictions may seem unfair, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Minnesota Senior Fed., 273 F.3d at 809 (quoting Beach Communications, 508 U.S. at 313).

The restrictions placed upon dedicated SSA funds by Congress were designed to prevent the very misuse committed by Ms. Morman. Ms. Morman admits that she knew her trip to Florida was not a proper use of dedicated funds. Ms. Morman knew the restrictions placed upon the dedicated funds. She had previously made expenditure requests that SSA had approved, including an expenditure for $5,995.95 for a new vehicle. When she began making more requests that SSA began to deny, Ms. Morman admits that she stopped making requests because she knew SSA would not approve them. This court finds substantial evidence that supports the ALJ's determination that the restrictions placed upon dedicated funds by Congress do not violate either Ms. Morman's or Tyquiesha's equal protection rights.

Ms. Morman also claims that the restrictions placed upon the dedicated funds constitute a regulatory taking because the restrictions decrease the value of the funds. In her brief, she claims that "[t]he funds paced [sic] in a dedicated account are owned by the child receiving disability benefits." However, Ms. Morman fails to cite any legal authority for the proposition that the dedicated funds are "owned" by Tyquiesha. For Ms. Morman's regulatory taking claim to succeed, she must prove Tyquiesha had a property right in the dedicated funds that was protected by the Fifth Amendment to the United States Constitution. She has failed to prove this proposition.

When Congress enacted the Social Security Act, it realized that the Act must evolve as the nation's social and economic conditions evolve. See Apfel, 151 F.3d at 746 (citing Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 51–52 (1986)). Thus, Congress reserved "[t]he right to alter, amend, or repeal any provision of" the Act. Id. (citing Bowen, 477 U.S. at 42). The United States Supreme Court has held that this

8

reservation provides Congress with the "concurrent power to affect the terms of [SSA] agreements." Id. (citing Bowen, 477 U.S. at 53–54). Thus, according to the Supreme Court, benefits provided under the Social Security Act do not "rise to the level of 'property' under the Fifth Amendment." Id. (citing Bowen, 477 U.S. at 55).

Tyquiesha did not have a property right in the dedicated funds. Although Congress provided SSA with the funds for Tyquiesha's care, it reserved the right to modify any provision of the Social Security Act pertaining to the dispersal of the funds. Congress had specifically set forth several conditions under which Tyquiesha was entitled to the dedicated funds. Tyquiesha did not have a right to the funds under any circumstance not outlined in section 1383 or approved by the Commissioner. Congress's reservation of authority over the dispersal of the dedicated funds precluded Tyquiesha from having a vested property right in the funds. Without a vested property right, the restrictions placed upon the dedicated funds do not constitute a regulatory taking.

### C. The Misapplied Funds Should be Refunded to the Commissioner

Ms. Morman claims that if this court affirms the ALJ's determination that the restrictions placed upon the dedicated funds are constitutional, the misapplied funds should be refunded to Tyquiesha's dedicated account, not to the Commissioner. This court finds nothing to suggest that the ALJ's determination that the funds be refunded to the Commissioner is improper.

As stated above, "any representative payee who knowingly misapplies benefits from such an account shall be liable to the Commissioner in an amount equal to the total amount of such benefits." § 1383(a)(2)(F)(ii)(III). Because Ms. Morman failed to show that the provisions relied upon by SSA and the ALJ are unconstitutional, her argument that the funds be returned to the dedicated account cannot succeed. When Congress enacted section 1383, it made a policy determination concerning where dedicated funds should be returned if misapplied. It is not arbitrary or capricious to require Ms. Morman to return the funds she misapplied to the Commissioner. Ms. Morman knew the restrictions placed

upon the funds, knew the consequences if those restrictions were not followed, and proceeded to misapply the money.

### D. The Dedicated Funds Were Misapplied

This court affirms the ALJ's affirmation of SSA's initial determination that Ms. Morman misapplied the dedicated funds in Tyquiesha's account. Ms. Morman has admitted that she knew the trip to Florida was not allowed under the restrictions placed upon the funds. As to her other claims that some of the allegedly misapplied funds actually went to cover debt and expenses attributable to Tyquiesha's care, Ms. Morman, as she admits in her brief, has failed to provide evidence of these expenditures. Moreover, Ms. Morman has failed to provide any evidence of where the numerous cash withdrawals between October and December 2000 went. Ms. Morman knew the restrictions placed upon the dedicated funds and the documentation requirements for expenditures. This is evident by Ms. Morman's signature and statement of understanding on the restriction memorandum and her previous requests and documentation regarding the dedicated funds. Between Ms. Morman's admissions of impropriety and her failure to provide evidence of what the expenditures were for, this court finds substantial evidence in support of the ALJ's determination that Ms. Morman misapplied the dedicated funds.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

August 2, 2005.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT